700 P.2d 1358

G & S INVESTMENTS, an Arizona general partnership; Oliver A. Jones, Jr.; Dr. Ross Chapin and Bette M. Chapin, husband and wife, Plaintiffs/Appellees/Cross-Appellants,

v.

Fred N. BELMAN, as the Personal Representative of the Estate of Thomas N. Nordale, deceased, Defendant/Appellant/Cross-Appellee.

No. 2 CA–CIV 4997.

Court of Appeals of Arizona, Division 2.

Nov. 30, 1984.

Review Denied April 11, 1985.

Miller & Pitt, P.C. by Robert A. Fortuno, Tucson, for plaintiffs/appellees/cross-appellants.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Michael J. Meehan and David A. McEvoy, Tucson, for defendant/appellant/cross-appellee.

## OPINION

HOWARD, Judge.

This case involves a partnership dispute arising out of the misconduct and subsequent death of Thomas N. Nordale. There are two principal issues in this case: whether the surviving general partner, G & S Investments, is entitled to continue the partnership after the death of Nordale, and how the value of Nordale's interest in partnership property is to be computed. The trial court, after making findings of fact and conclusions of law, entered judgment in favor of G & S Investments, finding that it had the right to continue the partnership and that the estate was owed $4,867.57. However, the trial court, without stating any reasons, failed to award G & S Investments the attorney's fees it requested pursuant to A.R.S. § 12–341.01. This failure is the subject of the cross-appeal filed by G & S Investments.

The record, including the findings of fact, disclosed the following. Century Park, Ltd., is a limited partnership which was formed to receive ownership of a 62-

unit apartment complex in Tucson. In 1982 the general partners were G & S Investments (51 per cent) and Nordale (25.5 per cent). The remaining partnership interest was owned by the limited partners, Jones and Chapin.

In 1979 Nordale began using cocaine, which caused a personality change. He became suspicious of his partners and other people, and he could not communicate with other people. He stopped going to work and stopped keeping normal business hours. He stopped returning phone calls and became hyperactive, agitated and angry toward people for no reason. Commencing in 1980 he made threats to some of the other partners, stating that he was going to get them and fix them.

Nordale lived in the apartment complex. This led to several problems. He sexually solicited an underage female tenant of the complex. Despite repeated demands, he refused to give up possession or pay rent on an apartment that the partnership had allowed him to use temporarily during his divorce. His lifestyle in the apartment complex created a great deal of tension and disturbance and frightened the tenants. At least one tenant was lost because of the disturbances.

Fundamental business and management disputes also arose. Nordale irrationally insisted upon converting the apartment complex into condominiums despite adverse tax consequences and mortgage interest rates that were at an all-time high. He also insisted on raising the rents despite the fact that recent attempts to do so had resulted in mass vacancies which had a devastating economic effect on the partnership enterprise.

By 1981 Gary Gibson and Steven Smith (G & S Investments) had come to the conclusion that Nordale was incapable of making rational business decisions and that they should seek a dissolution of the partnership which would allow them to carry on the business and buy out Nordale's interest.

The original complaint, filed on September 11, 1981, sought a judicial dissolution and the right to carry on the business and buy out Nordale's interest as permitted by A.R.S. § 29–238. The key allegations of the complaint were as follows:

"5. Defendant has become incapable of performing his part of Century Park's Articles of Limited Partnership ('the articles'), has been guilty of such conduct as tends to affect prejudicially the carrying on of Century Park's business, has willfully or persistently committed breaches of Century Park's articles and breaches of his fiduciary duties to Century Park and its partners, and otherwise has so conducted himself in matters relating to Century Park's business that it is not reasonably practicable to carry on the business in partnership with him.

6. Defendant wrongfully has caused a dissolution of Century Park in contravention of Century Park's articles and has acted with wreckless [sic] disregard of the rights of Century Park and its partners.

\* \* \* \* \* \*

8. Other circumstances render a dissolution of Century Park equitable including, but not limited to, the fact that plaintiffs cannot agree with defendant on the management of Century Park's business and the disposition of Century Park's assets."

The key provisions of the prayer for relief were as follows:

"1. Declaring that defendant wrongfully has caused the dissolution of Century Park in contravention of Century Park's articles and that Century Park has been dissolved or, alternatively, declaring a dissolution of Century Park.

\* \* \* \* \* \*

3. Declaring that plaintiffs may carry on Century Park's business without and to the exclusion of defendant, possess Century Park's property for that purpose, and for the purpose of buying out his interest and pay to defendant the value of his interest in Century Park."

After the filing of the complaint, on February 16, 1982, Nordale died. On June 28,

1982, appellees filed a supplemental complaint invoking their right to continue the partnership and acquire Nordale's interest under article 19 of the partnership's Articles of Limited Partnership. The key provisions of article 19 are as follows:

"(a) In the interest of a continuity of the partnership it is agreed that upon the death, retirement, insanity or resignation of one of the general partners ... that *the surviving or remaining general partners may continue the partnership business...*.

\* \* \* \* \* \*

(e) Rules as to resignation or retirement [which under Article 19(d) includes death].

\* \* \* \* \* \*

(2) In the event the surviving or remaining general partner shall desire to continue the partnership business, *he shall purchase the interest of the retiring or resigning general partner....*" (Emphasis added)

Such other facts will be set forth as are necessary to the issues presented by the parties.

## THE FILING OF THE ORIGINAL COMPLAINT

■ Appellant contends that the mere filing of the complaint acted as a dissolution of the partnership, requiring the liquidation of the assets and distribution of the net proceeds to the partners. He takes this position because he believes the estate will receive more money under this theory than if the other partners are allowed to carry on the business upon payment of the amount which was due to Nordale under the partnership agreement. Appellees contend that the filing of the complaint did not cause a dissolution but that the wrongful conduct of Nordale, in contravention of the partnership agreement, gave the court the power to dissolve the partnership and allow them to carry on the business by themselves. See A.R.S. § 29–238. We agree with appellees.

■ Contrary to appellant's contention, Nordale's conduct was in contravention of the partnership agreement. Nordale's conduct affected the carrying on of the business and made it impracticable to continue in partnership with him. His conduct was wrongful and was in contravention of the partnership agreement, thus allowing the court to permit appellees to carry on the business. See Crane on Partnership § 75, p. 430 (1968); *Zeibak v. Nasser*, 12 Cal.2d 1, 82 P.2d 375 (1938) (holding that a partner who had been guilty of such conduct as tended to affect prejudicially the carrying on of the business and which made it not reasonably practical for the remaining partners to carry on the business with him had wrongfully caused the dissolution of the partnership, and further holding that although the actual dissolution was effected by the decree of the court, nevertheless such dissolution was caused by the wrongful conduct of the plaintiff in contravention of the partnership agreement). See also *Drashner v. Sorenson*, 75 S.D. 247, 63 N.W.2d 255 (1954) and *Vangel v. Vangel*, 116 Cal.App.2d 615, 254 P.2d 919 (1953), aff'd in part, rev. in part and remanded, 45 Cal.2d 804, 291 P.2d 25 (1955). A.R.S. § 29–232(A) authorizes the court to dissolve a partnership when:

" \* \* \*

(2) A partner becomes in any other way incapable of performing his part of the partnership contract.

(3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business.

(4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him...."

In the case of *Cooper v. Isaacs*, 448 F.2d 1202 (D.C.Cir.1971) the court was met with the same contention made here, to-wit, that the mere filing of the complaint acted as a dissolution. The court rejected this contention. To paraphrase the reasoning of the court in *Cooper v. Isaacs*, supra, because

the Uniform Partnership Act provides for dissolution for cause by decree of court and appellees have alleged facts which would entitle them to a dissolution on this ground if proven, their filing of the complaint cannot be said to effect a dissolution, wrongful or otherwise, under the act; dissolution would occur only when decreed by the court or when brought about by other acts.

## ARTICLE 19 OF THE ARTICLES OF PARTNERSHIP

Article 19 of the Articles of Partnership provides that upon the death, retirement, insanity or resignation of one of the general partners the surviving or remaining general partners may continue the partnership business. It further provides that should the surviving or remaining general partners desire to continue the partnership business, they must purchase the interest of the retiring or resigning general partner. Appellant contends that by filing the complaint in this case the appellees caused Mr. Nordale to act in reliance on the complaint, to his detriment, and that appellees are therefore estopped from asserting the right to proceed under article 19. In particular, he points to a letter by Nordale sent to various persons. In this letter he solicited the purchase of an interest in his partnership, guaranteeing a return of the investors' funds by signing promissory notes or by giving letters of assurance. The letter contained the following language:

> "There is a serious dispute between the partners. A legal action has been filed by one of the partners, requesting dissolution of the partnership. A copy is enclosed. * * *
>
> Within four months, if either general partner sells to the other, the court will, by law, set value and order the property sold at auction."

The aggregate amount of pending creditors' claims against Nordale's estate derived from the sale of partnership interests is approximately $175,000.

■ There are three elements of equitable estoppel, or "estoppel in pais", (a) conduct by the party to be estopped by which he intentionally or negligently induces another to believe in a certain state of facts; (b) justifiable action by the party so induced in reliance, and (c) injury to the party relying on that conduct. See *Joy Enterprises, Inc. v. Reppel*, 112 Ariz. 42, 537 P.2d 591 (1975); *Holmes v. Graves*, 83 Ariz. 174, 318 P.2d 354 (1957). It is not essential that the actor actually intend to deceive, defraud or mislead another. *Waugh v. Lennard*, 69 Ariz. 214, 211 P.2d 806 (1949).

Appellant contends that since appellees filed a complaint alleging that the partnership had been dissolved it was reasonably foreseeable that Nordale would take some action in relying on that expression of appellees' position and that in fact Nordale did rely on the conduct to his detriment, committing himself to agreements with investors in anticipation of receiving his share of the property upon liquidation. We do not agree.

■ The original complaint did not merely request dissolution, but it also sought a statutory continuation and buy-out under A.R.S. § 29–238. It was apparent from the face of the complaint that there was no guarantee that the partnership's assets would be liquidated. Furthermore, Nordale filed an answer opposing all of the relief sought by appellees in their complaint prior to the time he sent out those letters. Appellees did nothing which would cause an estoppel.

## THE DEAD MAN STATUTE

Appellant contends the trial court erred in admitting certain testimony contrary to our dead man statute, A.R.S. § 12–2251, which provides that in a suit by or against the executor or administrator of an estate or guardian of an incompetent, neither party can testify to statements by the decedent or incompetent. This evidence consisted of testimony concerning (a) the nature of the partnership interest transferred by Hunter and Nordale and G & S (in other words, whether it was a transfer of a gen-

eral or limited partnership interest); (b) Nordale's understanding of the buy-out formula contained in paragraph 19 of the Articles of Partnership; (c) whether Nordale understood that G & S was substituted for Smith as a general partner in 1977; (d) whether Nordale understood that the partnership had assumed a certain debt (the Shadron debt) as a partnership liability and (e) whether Nordale thought that the consent of the personal representative would be required before the surviving general partner could continue the business.

Appellant wanted to keep such testimony from being admitted because he was contending that G & S was not a general partner, arguing that the amendment of the Partnership Agreement and Certificate substituting G & S was not valid and in conformity with the partnership agreement because the amendment was not signed by the limited partners. He was also contending that the shares which Hunter transferred to Nordale and G & S were not a general partnership interest but a limited partnership interest. Appellant was also seeking to inflate the value of Nordale's interest by excluding the Shadron debt, a $350,000 partnership liability, from the computation of the value of Nordale's interest. In addition, because appellant was contending that the buy-out formula in paragraph 19 of the Articles of Partnership meant something other than was stated in the agreement and because appellant was also contending that article 19 required the consent of the personal representative before a surviving general partner could continue the business, appellant did not want any testimony as to Nordale's understanding of this provision to be introduced into evidence.

In Arizona the application of the dead man statute is within the sound discretion of the trial court. *Cachenos v. Baumann,* 25 Ariz.App. 502, 544 P.2d 1103 (1976). The discretion of the trial court in admitting testimony concerning transactions with or statements by the decedent will be upheld where there is independent evidence to corroborate the transaction

with the decedent. *Cachenos v. Baumann,* supra; *Mahan v. First National Bank of Arizona,* 139 Ariz. 138, 677 P.2d 301 (App.1984). Gibson's testimony concerning the conversion of Hunter's limited partnership interest into a general partnership interest is corroborated by the partnership's capital accounts and tax returns and Nordale's execution of the amendment, on August 24, 1978, to the Certificate of Limited Partnership, among other things, all of which show that Nordale considered Hunter's shares to have been converted into general partnership shares. The testimony concerning the substitution of G & S for Smith is corroborated by the same evidence that corroborates the conversion of the Hunter interest into a general partnership interest. The testimony about the assumption of the Shadron debt is corroborated by the partnership's books and records of account. Further, the testimony about Nordale's understanding of article 19 was corroborated by James Harrison, who testified that Nordale told him Nordale did not have to make any disposition in his will in regard to Century Park because if he predeceased Smith and Gibson they would get it anyway. The trial court did not err in allowing the statements into evidence.

### THE TESTIMONY OF JAMES HARRISON

Over appellant's objection, W. James Harrison, an attorney, was permitted to testify to the conversation he had with Nordale which we have previously mentioned. Appellant contends that pursuant to A.R.S. § 12–2234, the trial court should have excluded Harrison's testimony because its admission would violate the attorney-client privilege. We do not agree. Harrison testified that he did not represent Nordale in connection with any matter concerning Century Park, that he was not engaged in the course of professional employment when the statement was made, and that Nordale sought no advice from him. The statement took place at a meeting which concerned only a personal matter among friends. Nordale wanted to show

Harrison that he was making a devise to him in his will. The attorney-client privilege hinges upon a client's belief that he is consulting a lawyer in that capacity and upon his manifested intention to seek professional legal advice. McCormick on Evidence, § 88, p. 179 (1972). The privilege does not apply where one consults an attorney not as a lawyer but as a friend or business advisor. McCormick, supra, at 179–80.

## THE CONSENT OF THE PERSONAL REPRESENTATIVE TO CARRY ON THE BUSINESS

■ Pursuant to A.R.S. § 29–302 the limited partnership filed a certificate of limited partnership which contained the following provision:

"(10–a) *Concurrence of general partners.* In all matters involving the partnership the written concurrence of both the general partners shall be required. In the event of the death, disability or absence of a general partner, his concurrence shall be expressed and authorized by his Personal Representative, Guardian, or Attorney-in-Fact, respectively."

In addition to the language which we have previously quoted, article 19 of the Articles of Limited Partnership contains the following:

"(d) [A] general partner shall be deemed to have resigned or retired upon his death ...

\* \* \* \* \* \*

(e) *Rules as to Resignation or Retirement.*

(1) A general partner may retire or resign as a general partner and *may* require the remaining general partner to acquire his interest as a general partner if the remaining general partner desires to continue the partnership business. In the event the remaining or surviving general partner does not desire to continue the partnership business, the partnership shall be dissolved in accordance with the terms and provisions of Article Fourteen." (Emphasis added).

Appellant contends that the foregoing paragraphs from article 19 together with paragraph 10–a of the Certificate of Limited Partnership require the personal representative to give his consent to the remaining general partners if the remaining general partners desire to continue the partnership business. The trial court disagreed with this contention and we agree with the trial court.

Article 10–a applies to the situation where the consent of the general partner is necessary and allows the personal representative of the deceased general partner to give this necessary consent. However, the consent of the deceased general partner is not necessary before the remaining general partners can elect to continue the business. Paragraph 10–a cannot be used to boot-strap a contrary conclusion. Nor does the use of the word "may" in article 19(e)(1) of the Articles of Limited Partnership detract from the absolute right of the remaining general partners to carry on the business.

Article 19(e)(1) does nothing more than state the corollary of 19(e)(2). If the surviving general partner continues the partnership, he must purchase the interest of the decedent's estate, and the estate "may require" him to do so if he does not.

## THE BUY–OUT FORMULA

Article 19(e)(2)(i) contains the following buy-out provision:

"The amount shall be calculated as follows:

By the addition of the sums of the amount of the resigning or retiring general partner's *capital account* plus an amount equal to the average of the prior three years' profits and gains actually paid to the general partner, or as agreed upon by the general partners, provided said agreed sum does not exceed the calculated sum in dollars." (Emphasis added)

Appellant claims that the term "capital account" in article 19(e)(2)(i) is ambiguous. The estate relies on the testimony of an

accountant, Jon Young, that the term "capital account" is ambiguous merely because there is no definition of the term in the articles. He claimed that it was not clear whether the cost basis or the fair market value of the partnership's assets should be used in determining the capital account. Even on direct examination, however, Young admitted that read literally the buy-out formula takes the capital account of the deceased partner and adds to that amount the average of the prior three years' earnings. On cross-examination he admitted that generally accepted accounting principles require the partnership capital accounts be maintained on a cost basis and that he has never seen a partnership in which the capital accounts in the books and records were based on the fair market value. He also admitted that his interpretation was contrary to the literal import of the words used in the agreement and that the words used were not ambiguous and that he had no knowledge of the actual intent of the parties. The sole reason given by Young for his opinion that "capital account" should not be interpreted in accordance with its literal meaning and with generally accepted accounting principles was that he himself had never seen a buy-out provision for real property based on a cost basis of the assets.

In contrast, Gibson and Smith testified that the parties actually intended and understood "capital account" to mean exactly what it literally says, the account which shows a partner's capital contribution to the partnership plus profits minus losses. Smith, an accountant, further testified that while there is a relationship between the capital accounts and valuation of the partnership assets, the valuation of the assets does not affect the actual entries made on the capital account.

There was no dispute that Nordale's capital account showed a negative balance of $44,510.09, which the court found to be a fact and concluded that the purchase price of Nordale's interest should be calculated in accordance with article 19(e)(2), the capital account, and that his interest in the partnership was zero, instead of the fair market value of his interest in the partnership which would have amounted to the sum of $76,714.24.

Appellant contends that the conclusions of the trial court were erroneous, that fair market value should have been used instead of the balance in the capital account and that, even then, the fair market value which the court found was far in excess of the $76,714.24. We disagree with appellant and agree with the trial court's conclusions.

■■■■ The words "capital account" are not ambiguous and clearly mean the partner's capital account as it appears on the books of the partnership. Our conclusion is further buttressed by the entire language of article 19(e)(2)(i) which requires, for a buy-out, the payment of the amount of the partner's capital account plus other sums. This is "capital account" language and not "fair market value" language. Appellant relies on the case of *Mahan v. Mahan*, 107 Ariz. 517, 489 P.2d 1197 (1971) for its position that even if the partnership agreement did require the buy-out on the basis of the capital account, because of the disproportion between the capital account and the fair market value of the property, equity mandates the use of the fair market value. We find that *Mahan v. Mahan*, supra, is not on point and, unfortunately, in dictum, misstates the law. *Mahan* involved the dissolution and liquidation of a partnership, not the enforcement of a buy-sell agreement. It also involved the definition and use of the term "book value", which is not synonymous with the term "capital account." In any event, the *Mahan* partnership was not continued after the death of one of the partners. In a suit by the widow of the deceased partner the trial court ruled that his estate was entitled to receive only a proportional share of the book value of the partnership's assets. The supreme court reversed, holding that "book value" is used only in ascertaining the respective shares when there is an explicit contractual provision to that effect and "[h]ere there was no contractual provision mandating the use of

book value." 107 Ariz. at 521, 489 P.2d 1197.

Although it was unnecessary for the court to go any further in deciding the case, it went on to state that a contractual provision mandating the use of book value "is not used where the facts of the case make it inequitable to do so" and that such a provision would have been inequitable because the book values of the assets were disproportionate to actual values.

Our supreme court has held on many occasions that dictum is not controlling precedent. See for example, *Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 638 P.2d 1324 (1981) reh. den., 459 U.S. 899, 103 S.Ct. 199, 74 L.Ed.2d 160; *Hernandez v. County of Yuma*, 91 Ariz. 35, 369 P.2d 271 (1962); *In re Moore's Estate*, 67 Ariz. 65, 190 P.2d 914 (1948).

Furthermore, the dictum in *Mahan* misstates the law. The only authority cited in *Mahan* is an annotation in 47 A.L.R.2d 1425, 1427. With one exception, every case cited in that annotation upholds a buy-out agreement based upon book values against the claim that the purchase price should be based on fair market value. The lone exception is *Egan v. Wirth*, 26 R.I. 363, 58 A. 987 (1904), in which the partnership's assets were carried on the books at a low figure after the death of one of the partners to assist in probating his estate. Although the facts of the case are not well stated, the opinion implies that the book values had been manipulated to reduce them. Under that particular circumstance, the court held that the use of book value would be inequitable.

In this case, assuming that the terms "book value" and "capital account" are functional equivalents, Nordale's capital account had not been manipulated in any way. There is no reason why the general rule and the agreement of the parties should not apply.

"Where the agreement stipulates that. for purposes of assessing the purchase price of a partner's share by his survivors or associates the book value of such share shall be used, the courts have de-

nied contentions for purchase prices based on real values." 60 Am.Jur.2d Partnership § 254, p. 159 (1972).

And, in *Anderson v. Wadena Silo Company*, 310 Minn. 288, 246 N.W.2d 45 (1976), a case relied upon by appellant, the court stated:

"It would be inequitable to require a partner to sell his interest in a partnership for a price which does not reflect its true value *unless it is clear that the partner explicitly agreed to do so.*" (Emphasis added) 246 N.W.2d at 48.

■ Because partnerships result from contract, the rights and liabilities of the partners among themselves are subject to such agreements as they may make. Crane & Bromberg, Law of Partnership § 65, p. 365 (1968).

■ Partnership buy-out agreements are valid and binding although the purchase price agreed upon is less or more than the actual value of the interest at the time of death. *In re Estate of Dillon*, 575 P.2d 127 (Okla.App.1977); *Gabay v. Rosenberg*, 29 A.D.2d 653, 287 N.Y.S.2d 451 (1968), aff'd 23 N.Y.2d 747, 296 N.Y.S.2d 795, 244 N.E.2d 267 (1968) (upholding a nominal purchase price of $100 where the partnership owned two parcels of improved land); *In re Randall's Estate*, 29 Wash.2d 447, 188 P.2d 71 (1947) (upholding a purchase price less than one-fourth of the value of the decedent's interest); 60 Am. Jur.2d Partnership § 254, p. 158 (1972).

■ Buy-out agreements are enforceable even when they provide that the decedent's interest shall pass to the survivors without any payment. *Hale v. Wilmarth*, 274 Mass. 186, 174 N.E. 232 (1931) (in which the decedent held a one-fourth interest in a partnership that owned a jewelry factory); *Balafas v. Balafas*, 263 Minn. 267, 117 N.W.2d 20 (1962) (in which the decedent had a one-half interest in a partnership that owned $700,000 worth of securities). The rationale of the cases enforcing such agreements is stated in *Pailthorpe v. Tallman*, 72 N.Y.S.2d 784 (1947):

"[T]he question is not whether the executors of the Mass estate received the full net value of the interest of Mass in the partnership business as of the date of his death, but rather, did they receive for such interest the *amount contemplated* by the partners in their agreement. . . . An agreement by partners as to any matter relating to their partnership is completely controlling between them." (Emphasis in original)

The law in Arizona is that a valid contract must be given full force and effect even if its enforcement is harsh. It is not within the power of this court to revise, modify, alter, extend or remake a contract to include terms not agreed upon by the parties. *Isaak v. Massachusetts Indemnity Life Insurance Company,* 127 Ariz. 581, 623 P.2d 11 (1981).

■ We do not have the power to rewrite article 19 based upon subjective notions of fairness arising long after the agreement was made or because the agreement did not turn out to be an advantageous one. Modern business practice mandates that the parties be bound by the contract they enter into, absent fraud or duress. *Hernandez v. Banco de las Americas,* 116 Ariz. 552, 570 P.2d 494 (1977). It is not the province of this court to act as a post-transaction guardian for either party.

## THE CROSS–APPEAL

In its minute entry awarding judgment to appellees, the trial court, without giving appellees an opportunity to be heard on the subject, denied appellees their attorney's fees. Appellees then filed a motion to reconsider, alleging that at a hearing they would show, inter alia, that defendant refused several substantial settlement offers before the trial and that they had incurred attorney's fees in the sum of approximately $40,000. The trial court denied the motion stating that "... it is comfortable with its ruling in this particular case in not making an award of attorney's fees and declines to reconsider its ruling."

■ Although the award of attorney's fees under A.R.S. § 12–341.01(A) and (B) is discretionary, it is the clear intent of the statute that under ordinary circumstances the successful party in an action which falls under the statute is entitled to recover reasonable attorney's fees. *Grand Real Estate, Inc. v. Sirignano,* 139 Ariz. 8, 676 P.2d 642 (App.1983). The various factors that might influence the trial court in deciding whether to award the prevailing party his fees include (1) the merits of the claim or defense presented by the unsuccessful party; (2) whether litigation could have been avoided or settled and whether the successful party's efforts were thus completely superfluous in achieving the results; (3) assessing fees against the unsuccessful party would cause an extreme hardship; (4) the successful party did not prevail with respect to all other relief sought. See *Wheel Estate Corporation v. Webb,* 139 Ariz. 506, 679 P.2d 529 (App.1983).

The record before us is devoid of reference to any of the possible underlying reasons for the trial court's denial of appellees' motion for an award of attorney's fees. As was noted by the court in *Associated Indemnity Corporation v. Warner,* 143 Ariz. 585, 694 P.2d 1199 (1983) the better practice would be for the trial judge to state on the record the factors and reasons which were taken into account in denying or reducing the fee request. In *Grand Real Estate v. Sirignano,* supra, the court said:

"In the posture of this case, the court was required to exercise its discretion based on the stipulation, the statute, the facts and circumstances shown by the record, and any other applicable law. It would be improper to deny attorney's fees to the prevailing party for no reason at all, or simply because the court chose to ignore the statute or the issue presented. In order to sustain a denial of fees under the circumstances of this case, the record must disclose some reasonable factual justification for the denial. This

is but an application of the general rule that while, absent a request for findings of fact, a trial judge is not required to set forth the underlying factual basis for his decision, [citations omitted] nevertheless, the judgment of a trial court must find some reasonable support from the evidence or lack of evidence. [citations omitted]

Possibly the trial court concluded that the plaintiff's claim was so meritorious that, even though defendant prevailed, there was no reason to apply the statute so as to mitigate his financial burden caused by the plaintiff's suit. Of course, we have no hint as to the basis of the court's disallowance of fees. While plaintiff's claim was assuredly not frivolous, and presented arguable issues, nevertheless under the then current Arizona statutes and decisions the applicable law was not abstruse.... To a court fully informed as to the facts and the law, it should have been apparent that the claim was untenable and lacked that degree of merit which would justify withholding attorney's fees to the prevailing party. Hence, if the trial court based its decisions *solely* on the relative merits of plaintiff's claim and defendant's defense, denial of attorney's fees was not justified." (Emphasis in original) 676 P.2d at 648–49.

The record here demonstrates that a reasonable trial court judge could have concluded that the issue of the applicability of *Mahan* was meritorious enough to deny the request for attorney's fees.

Appellees' motion for attorney's fees on appeal is granted and their attorney is directed to file an affidavit of fees and costs pursuant to *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983) for defense of the appeal.

Judgment affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.