730 P.2d 245

**IMPERIAL LITHO/GRAPHICS, an Arizona corporation, Plaintiff-Appellee, Cross-Appellant,**

v.

**M.J. ENTERPRISES, an Arizona partnership; Morris A. Lerner and Eleanor Jean Lerner, his wife, Defendants-Appellants, Cross-Appellees,**

v.

**Jerry J. WISOTSKY and Helen Wisotsky, his wife, Counterdefendants-Appellees, Cross-Appellants.**

No. 1 CA–CIV 7861.

Court of Appeals of Arizona, Division 1, Department B.

June 5, 1986.

Reconsideration Denied Aug. 29, 1986.

Review Denied Dec. 16, 1986.

Daughton, Feinstein & Wilson by Allen L. Feinstein, R. Stewart Halstead, Joanne T. Stark, Phoenix, for defendants-appellants, cross-appellees.

Ellis, Baker, Lynch, Clark & Porter, P.C. by William D. Baker, and Robert F. Clarke, P.C. by Robert F. Clarke, Phoenix, for plaintiffs-appellees, cross-appellant.

## OPINION

JACOBSON, Presiding Judge.

The major issue in this appeal is whether a partnership agreement that provides methods by which the partnership can be terminated precludes dissolution of the partnership under the Uniform Partnership Act.

This case arises out of the breakup of a long-standing business relationship between Morris Lerner and Jerry Wisotsky. From 1963 until 1982 Lerner and Wisotsky were the sole and equal shareholders in Imperial Litho/Graphics (Imperial). They are also the sole and equal partners in M.J. Enterprises (the partnership), a real estate partnership which was formed in 1963 in order to lease property to Imperial and provide tax benefits to the individual partners.

As the result of the deterioration of their personal relationship, in 1982 Lerner and Wisotsky executed a purchase and redemption agreement whereby Wisotsky acquired all the stock in Imperial. The agreement included a five-year non-competition covenant, in which Lerner promised not to compete with Imperial, reveal confidential information, or degrade, malign, or disparage the name, good will or reputation of Wisotsky or Imperial. As consideration for this covenant, Imperial was to pay Lerner $250,000 without interest in five annual installments of $50,000. Three provisions of the purchase and redemption agreement related to properties owned by the partnership. Except for those express provisions, the partnership was unaffected by the agreement.

Imperial filed a complaint against the partnership and Lerner in 1983 seeking: (1) judgment against the partnership for advances; (2) a declaration that Lerner had breached the non-competition covenant and that Imperial had no duty to make payments on the covenant; and (3) judgment against Lerner for damages to Imperial resulting from breach of the covenant.

The partnership and Lerner answered the complaint denying that the partnership owed monies to Imperial and alternatively that, if monies were owed, the partnership was entitled to a setoff for tax and utility payments. The answer further denied that Lerner had breached the non-competition covenant. The partnership and Lerner also asserted three counterclaims against Imperial and Wisotsky: (1) recovery by the partnership against Imperial for taxes and utility bills paid by the partnership; (2) judgment for Lerner against Imperial for payments due under the purchase and redemption agreement and for anticipatory breach, and judgment against Wisotsky for con-

tract interference; and (3) dissolution of the partnership.[1]

In reply, Imperial filed a general denial and asserted affirmative defenses to the first two counterclaims. In a separate answer Wisotsky denied the allegations against him and opposed dissolution of the partnership alleging that by filing the counterclaim Lerner had withdrawn from the partnership and was to be paid in accordance with the partnership agreement as a "withdrawing partner."

This matter was tried to the court which awarded Imperial judgment against the partnership in the amount of $64,813.87 plus interest; declared the non-competition covenant to be in full force and effect; denied Lerner relief on his counterclaims; awarded judgment in favor of Wisotsky holding that Lerner was a "withdrawing partner" and bound by the terms of the partnership agreement regarding withdrawing partners; and awarded Imperial and Wisotsky their costs and attorney's fees.

The partnership and Lerner have appealed from the trial court's failure to enter a judgment against Imperial on the non-competition covenant and from those portions of the judgment finding the partnership liable in monetary damages to Imperial, declaring Lerner to be a withdrawing partner and denying dissolution and awarding attorney's fees and costs to Imperial and Wisotsky. Imperial and Wisotsky have filed a cross-appeal from that portion of the judgment finding that Lerner was not in breach of the non-competition covenant.

## NON–COMPETITION COVENANT

The non-competition covenant of the purchase and redemption agreement provides:

During the period of five years from the closing of this Agreement, the selling shareholder shall not (a) be employed by, associate with, or render consulting or advisory services to, any person or company engaged in business in competition with the Imperial business, or (b) other-

wise compete in any way directly or indirectly with the Imperial business, or (c) reveal or make known to any person or company any confidential knowledge or information of any facts concerning any costing rates and structure, formulae, methods, processing, manufacturing or compounding process, and types and kinds of raw materials and products used in the Imperial business, or (d) divulge or make known directly or indirectly the names or addresses of any customers or suppliers of Imperial, or solicit directly or indirectly any customers or suppliers of Imperial, or (e) degrade, malign, or in any way disparage the name, good will, or reputation of the remaining shareholder, Imperial, or the Imperial business. In consideration of such covenant by the selling shareholder, Imperial shall pay to the selling shareholder the sum of $250,-000, without interest, payable in five annual installments of $50,000 each, by one year, two years, three years, four years, and five years after the closing of this Agreement.

The transaction closed on March 31, 1982. However, Imperial did not pay Lerner the $50,000 due on March 31, 1983 or the $50,000 due on March 31, 1984.

Imperial defended its failure to pay Lerner on grounds that Lerner had breached the covenant.

The trial court made an express finding that Lerner had not breached the non-competition covenant and that Imperial was bound to pay the overdue installments. Nevertheless, the trial court declined to enter judgment in favor of Lerner for the unpaid amounts.

Lerner contends that he was entitled to judgment for $100,000 representing the installments due at time of trial plus an award of interest at the legal rate from the due date of each principal installment.

In its cross-appeal, Imperial argues that there was no evidence from which the trial court could conclude that Lerner had not

1. The pleadings also named the spouses of Lerner and Wisotsky as parties for purposes of reaching any interests of their respective marital communities.

breached the non-competition covenant. Accordingly, it seeks reversal of the judgment on this issue. We consider first Imperial's cross-appeal.

### 1. Cross-Appeal

■ The trial court's findings of fact are binding on this court unless they are clearly erroneous or unsupported by any credible evidence. *Wean Water, Inc. v. Sta-Rite Industries, Inc.*, 141 Ariz. 315, 686 P.2d 1285 (App.1984). In reviewing the trial court's findings, our duty begins and ends with inquiring whether the trial court had before it evidence reasonably supporting its action viewed in the light most favorable to sustaining the findings; this court will not weigh conflicting evidence on appeal. *Tanque Verde Enterprises v. City of Tucson*, 142 Ariz. 536, 691 P.2d 302 (1984).

Imperial identifies evidence in support of its contention that Lerner breached the non-competition covenant by: (1) attempting to lure Imperial's sales manager, James O'Brien, away from the company; (2) disparaging the credit worthiness of Imperial to Ed Stein, the company's insurance agent; (3) telling Brian O'Boyle, the company's banker, that Lerner could run the business better than Wisotsky; and (4) forgiving a debt owed to Imperial by the Governor's Commission on the Arizona Environment. Imperial asserts there is no evidence to the contrary and that Lerner's only defense to these charges was that they resulted in no actual harm to Imperial. We find this to be an inaccurate characterization of the record.

First, we find evidence in the record that Lerner did not attempt to induce O'Brien away from Imperial. Lerner testified that while he was still associated with Imperial, he and O'Brien worked closely together and had a good personal relationship. Lerner also testified that during buy out negotiations, O'Brien had expressed his fear that should Lerner leave Imperial, Wisotsky might fire him. Lerner testified that he told O'Brien if Lerner were to leave the company and Wisotsky were to fire O'Brien, Lerner would pay O'Brien the equivalent of O'Brien's salary for one year. The existence of this close relationship between Lerner and O'Brien and the offer to pay his salary was confirmed by O'Brien's testimony. However, O'Brien's testimony was that Lerner rather than O'Brien was fearful that Wisotsky might fire O'Brien.

The specific event identified by Imperial as Lerner's attempt to induce O'Brien to leave Imperial was a conversation between O'Brien and Lerner which occurred shortly after Lerner left Imperial. Evidence concerning the substance of that conversation is contradictory. O'Brien's testimony supports Imperial's position that Lerner suggested he leave Imperial and take a position which would put him in competition with Imperial. Lerner's testimony is to the contrary.

■ Imperial points out that it is relying on the testimony of a "disinterested" person, that is, O'Brien, while Lerner is relying on his own testimony. It appears to argue that because Lerner is an interested party, his testimony is insufficient to support a finding that he did not attempt to have O'Brien leave Imperial. It is well established that the testimony of an interested party is competent evidence; interest merely goes to its credibility. *See generally* C.T. McCormick, *Law of Evidence* § 65 (3d Ed.1984) The credibility of witnesses is a matter peculiarly within the province of the trier of facts. *Brevick v. Brevick*, 129 Ariz. 51, 628 P.2d 599 (App.1981). It is not the prerogative of this court to weigh the evidence and determine the credibility of the witnesses. *Van Emden v. Becker*, 6 Ariz.App. 274, 431 P.2d 915 (1967). The trial judge could properly find that the alleged conversation was not a breach of the non-competition covenant on the basis of Lerner's testimony.

■ We also find evidence that Lerner did not disparage the credit worthiness of Imperial to Ed Stein. Stein was an insurance agent for Imperial, the partnership and for Lerner personally. After Lerner left Imperial, he met several times with Stein to discuss changes in his insurance

policies and personal matters. During these conversations they talked about a variety of subjects including Lerner's irritation in being asked by Imperial's banker to subordinate his loan to the bank's loan against Imperial. Stein testified that on one occasion Lerner stated that Imperial would have a difficult time in renewing its loan or in obtaining a new loan in the absence of Lerner. Imperial argues that this statement was a "disparagement" of Imperial's reputation.

The testimony of both Stein and Lerner support a conclusion that the purpose of the conversations was to change Lerner's life insurance policies to reflect the change in his business relationship with Imperial. There is no indication that the statement concerning loan renewal was made in the context that Imperial would not be able to pay for its insurance needs, but rather was a comment on the changing status of Imperial following the buy out by Wisotsky. It was reasonable for Lerner to comment that Imperial would have more difficulty in borrowing without his personal guarantee and in light of his refusal to subordinate Imperial's obligation to him. We do not find that this rises to the level of "disparagement." Stein himself testified that, to his knowledge, Lerner did not do anything to hurt Imperial after the buy out.

Imperial also relies on the testimony of Brian O'Boyle that Lerner indicated he could run Imperial better than Wisotsky as evidence that Lerner violated the non-competition covenant.

O'Boyle was a commercial loan officer for Great Western Bank & Trust, with which Imperial maintained its account and which held mortgages on the partnership property. O'Boyle met with Lerner to request that Lerner subordinate Imperial's obligation to him to Imperial's loan from Great Western. O'Boyle told Lerner that Imperial was having "a very tough time," and was in default on the Great Western loan. Lerner stated that he hoped Imperial would "make it, because I need to have them exist," in order for Imperial to make monthly payments to him. Nonetheless, he refused to subordinate Imperial's obligation to him.

Lerner's comment with respect to his ability to run the business better than Wisotsky was made in the context of his unwillingness to subordinate the loan. Further, it is clear from the overall conversation that Lerner was not attempting to damage Imperial's reputation. To the contrary, he had a personal stake in the company's financial success.

Finally, we consider Imperial's assertion that Lerner violated the non-competition covenant by forgiving a debt due to Imperial by the Governor's Commission on the Arizona Environment. Alicia Ray, the Executive Director of the Commission, testified that Lerner had been a member of the Commission for approximately 10 years. She further testified that it was common for Lerner and others to donate services to the Commission, a non-profit agency. The practice was to send a statement with the services so that the Commission would know what the services were worth, and then to convert the statement to a donation at the end of the year. Wisotsky knew of this practice which went on over a 10–year period of time and he himself engaged in it. There was no evidence that Lerner forgave an indebtedness after he left the corporation.

We find sufficient evidence to support the trial court's conclusion that Lerner did not violate the non-competition covenant contained in the purchase and redemption agreement.

*2. Was Lerner entitled to a judgment for $100,000 plus interest?*

The judgment expressly found that the purchase and redemption agreement had not been breached by Lerner. Yet, the trial court did not award judgment for the installments due and owing to Lerner. ($100,000), nor did it award interest.

Imperial argues that Lerner is not entitled to interest because the language of the non-competition provision provides that $250,000 is to be paid without interest. It

further asserts that A.R.S. § 44–1201 supports this contention in that it provides:

Interest on any ... judgment ... shall be at the rate of ten percent per annum, *unless a different rate is contracted for in writing,* in which event any rate of interest may be agreed to. (Emphasis added.)

A.R.S. § 44–1201(A). It argues that the rate of interest agreed to by the parties in this case was zero.

A reasonable interpretation of the agreement leads to the conclusion that it deals only with interest due prior to maturity. It is silent as to the effect of failure to pay on the due date. The law is well established that a provision for payment of a sum of money without interest applies only to the payment of interest to maturity. As stated by one commentator:

If a definite sum of money is lent to be repaid without interest at the end of a specified time, on failure to pay at that time the lender can recover judgment for the amount of money so lent, with interest at the legal rate after maturity.

5 *Corbin on Contracts* § 1046 (1964).

This general proposition is supported by case law from various jurisdictions. *See e.g., Nesbit v. MacDonald,* 203 Cal. 219, 263 P. 1007 (1928); *Jenkins v. Morgan,* 100 Ga.App. 561, 112 S.E.2d 23 (1959); *Allen v. Miller,* 84 N.W.2d 571 (N.D.1957); *Gruhler v. Hossapaus,* 195 N.E.2d 387 (Ohio Prob. 1963). Arizona case law is in accord. In *Palmcroft Development Co. v. City of Phoenix,* 46 Ariz. 400, 51 P.2d 921 (1935), our supreme court stated:

The contract stipulated that the loans were made to be repaid without interest and there was no obligation to pay interest until the debts became due. After the debts became due and payable, under section 1883, Revised Code of 1928, [the predecessor of A.R.S. § 44–1201], they should bear interest at the legal rate.

*Id.* at 400–401, 51 P.2d at 921.

Interest on a liquidated debt is due as a matter of right. A.R.S. § 44–1201; *Matter of Estate of Estes,* 134 Ariz. 70, 654 P.2d 4 (App.1982); *Arizona Title*

*Ins. & Trust Co. v. O'Malley Lumber Co.,* 14 Ariz.App. 486, 484 P.2d 639 (1971). Accordingly, we find that the trial court erred in failing to enter judgment for Lerner on the two payments which became due and payable prior to entry of formal judgment, that is, on March 31, 1983 and March 31, 1984. Judgment should have been granted to Lerner for $100,000 plus the legal rate of interest from the date of maturity of these debts.

## M.J. ENTERPRISES

The trial court found that Lerner was a withdrawing partner from the partnership and was bound by certain provisions of the partnership agreement relevant to a withdrawing partner.

Lerner argues that the trial court erred in denying his counterclaim for dissolution and in restricting his rights to that of a withdrawing partner. He claims that: (1) the evidence was uncontroverted that there were statutory grounds for dissolving the partnership; (2) the mere filing of a counterclaim does not constitute a withdrawal; (3) the trial court was without authority to enter a judgment beyond granting or denying a dissolution; and (4) the decision of the trial court may have harsh and inequitable results.

In response, Wisotsky argues that Lerner's conduct in filing the counterclaim violated the partnership agreement and constituted withdrawal as a matter of law. He further argues that this issue was properly before the trial court and that this court cannot rewrite the partnership agreement to save Lerner from the economic consequences of his action.

### 1. Dissolution

Lerner first contends that under the provisions of the Uniform Partnership Act, he was entitled to a dissolution of the partnership and the trial court erred in failing to grant such dissolution. Corollary to this argument is the contention that the trial court erred in considering Lerner a "with-

drawing" partner under the partnership agreement.[2]

Lerner's basic contention is that under the provisions of the Uniform Act he has an absolute right to seek dissolution of the partnership. We agree. A.R.S. § 29–231 provides two methods by which a partnership may be dissolved, either without breach of the partnership agreement (in the words of the Uniform Act, "without violation of the agreement") or in breach of the partnership agreement (again in the words of the Uniform Act, "in contravention of the agreement"). Thus, whether Lerner breaches the partnership agreement by seeking dissolution only goes to the amount that he may recover upon dissolution (*see* A.R.S. § 29–238)[3] and not the absolute right granted under the act to have dissolution occur.

This is the view taken by the official comments to the Uniform Act:

> The relation of partners is one of agency. The agency is such a personal one that equity cannot enforce it even where the agreement provides that the partnership shall continue for a definite time. The power of any partner to terminate the relation, even though in doing so he breaks a contract, should, it is submitted, be recognized.

Unif. Partnership Act § 31 Official Comment, 9 U.L.A. 377 (1969). *See also Napoli v. Domnitch*, 18 A.D.2d 707, 236 N.Y.S.2d 549, *aff'd*, 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 (1962); *Babray v. Carlino*, 2 Ill.App.3d 241, 276 N.E.2d 435 (1971).

In addition to the right to terminate at will, a partner may seek judicial dissolution for the reasons stated in A.R.S. § 29–232.

Wisotsky does not seriously argue that Lerner cannot at anytime seek a dissolution of the partnership, but argues that by seeking such a dissolution he becomes a "withdrawing" partner under the partnership agreement and is entitled to be reimbursed only for his partnership interest as a "withdrawing" partner and cannot, under any circumstances, seek a judicial dissolution of the partnership. In support of this contention he cites *Hunter v. Straube*, 273 Or. 720, 543 P.2d 278 (1975); *Devlin v. Rockey*, 295 F.2d 266 (7th Cir.1961); *Adams v. Jarvis*, 23 Wis.2d 453, 127 N.W.2d 400 (1964); *Ashley v. Lance*, 75 Wash.2d 471, 451 P.2d 916 (1969); *Gibson v. Angros*, 30 Colo.App. 95, 491 P.2d 87 (1971); *Straus v. Straus*, 254 Minn. 234, 94 N.W.2d 679 (1959).

The gist of these cases is that where a partnership agreement provides the manner in which it shall terminate and provides that the partnership shall continue after withdrawal of a partner, partners "cannot, by merely calling their withdrawal a dissolution, escape from the liabilities which they assumed when they executed the partnership agreement." *Hunter v. Straube*, 273 Or. at 728, 543 P.2d at 282.

However, all of these cases, except *Straus v. Straus*, involved medical partnership agreements which contained specific provisions dealing with non-competition clauses applicable to a withdrawing partner or the payment of partnership interests by a "voluntary or involuntary" withdrawing partner. These cases stand for the proposition that a partner cannot, under the guise of a voluntary dissolution, avoid his contractual obligation not to compete or be

---

**2.** This is more than a dispute over terminology. Under the Partnership Agreement a withdrawing partner "shall be entitled to receive an amount equivalent to his capital account and his income account, as they appear on the books of the Partnership...." Wisotsky has alleged in this court that one half of the amount in the capital account is the negative figure of $139,-806.00, (that is, each partner owes the partnership $139,806.00) and this is all that Lerner is entitled to as a statutory "withdrawing" partner. On the other hand, Wisotsky alleges that the partnership real property has a value of $5,500,-

000.00. Of course, upon dissolution, this value would be equally divided between the two partners. A.R.S. § 29–238.

**3.** Under A.R.S. § 29–238, the only difference between a dissolution without "contravention of the agreement" and a dissolution "in contravention" of the agreement is that "the right [of the non-breaching partner], as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement." A.R.S. § 29–238(B)(1)(a).

paid in accordance with the partnership agreement.

These cases do not stand for the proposition that if one partner "wilfully or persistently commits a breach of the partnership agreement" (A.R.S. § 29–232), the non-breaching partner cannot seek a judicial dissolution of the partnership and is limited to "withdrawing" with the concomitant partnership agreement sanctions.

In fact, the one non-medical case cited by Wisotsky, *Straus v. Straus*, especially recognizes that a partner has a right to seek judicial dissolution of the partnership.

We agree with the reasoning of *Cooper v. Isaacs*, 448 F.2d 1202 (D.C.Cir.1971):

> We do not believe it can be said at this time ... that the partnership agreement involved here was clearly meant to exclude the possibility of dissolution of the partnership by decree of court under [§ 32 of the Uniform Partnership Act—A.R.S. § 29–232]. True, the partnership agreement does discuss certain ways by which the partnership can be terminated and states that their partnership 'shall continue until terminated as herein provided.' [Citation omitted.] However, it may well be that the parties did not consider the possibility that serious disagreements would arise at the time they made the agreement; the language limiting the methods of terminating the partnership may have been intended only to prevent a partner from dissolving the partnership voluntarily and without good cause.

*Id.* at 1206.

■ Like in *Cooper*, the partnership agreement here is silent as to dissolution for cause and distribution of partnership assets in such a situation. The agreement only speaks to voluntary dissolution upon agreement of all partners. Moreover, the agreement is silent as to what constitutes a "withdrawal" by a partner. Under these circumstances, we hold that Lerner was entitled to seek judicial dissolution of the partnership for cause. We further hold that the mere filing of such a complaint does not constitute an intention to with-

draw within the meaning of the partnership agreement. *Cooper v. Isaacs, supra; G & S Investments v. Belman*, 145 Ariz. 258, 700 P.2d 1358 (App.1984).

Both parties agreed at the time of oral argument that the trial court denied Lerner's petition for dissolution solely on the ground that the partnership agreement precluded dissolution and distribution pursuant to the Uniform Act. The trial court did not reach the issue of whether factually Lerner was entitled under A.R.S. § 29–232 to dissolution. Because we hold that such dissolution and distribution is allowable the matter is remanded for further proceedings. In this regard we express no opinion as to whether Lerner is entitled to dissolution under A.R.S. § 29–231(A) or A.R.S. § 29–232.

## WAS THE PARTNERSHIP LIABLE TO IMPERIAL FOR ADVANCES?

■ Both parties agree that over the years since 1963, Imperial advanced monies to the partnership so that it could meet its financial obligations and Lerner and Wisotsky could obtain tax advantages. The record contains a promissory note from the partnership to Imperial reflecting some of the advances. These advances and the partnership's obligation and intent to repay are also reflected in its financial statement of December 31, 1980. The partnership's own accountant testified that advances were treated as a payable of the partnership and as a receivable of Imperial.

Lerner and the partnership contend that in spite of this evidence, the advances were never intended to be repaid. They argue that there is evidence that funds were moved back and forth between Imperial and the partnership "as one pocketbook" for the personal benefit of Wisotsky and Lerner. We agree that the record would support this position. It is not our role, however, to determine whether there is support for this version of the facts. Rather, as previously discussed, our inquiry is simply whether there is evidence to support the trial court's findings of fact.

The promissory note, the financial statements of both the partnership and Imperial, and the testimony of Bernard Goldstein, the bookkeeper for both, amply support the conclusion that the partnership owed Imperial $64,813.87 for advances.

It is next contended that even if the court were correct in finding that the advances were intended to be repaid, the court should have offset this amount by Imperial's obligation to pay utilities and property taxes on the land it leased from the partnership. They correctly point out it was undisputed that the leases imposed an obligation to pay taxes upon Imperial. Likewise, it was undisputed that Imperial did not pay such taxes. Nevertheless, there is evidence to support the trial court's conclusion that these payments should not be used as an offset.

The evidence was that the partnership paid the taxes which were then passed on through the partnership to Lerner and Wisotsky individually for the purpose of obtaining tax benefits. The partnership's accountant testified that the partnership's records do not show any receivables due for rent from Imperial. A certified audited balance sheet of Imperial for 1980, prepared by the partnership's accountants, shows that there were no payables to the partnership for taxes. Likewise, the bookkeeper testified that Imperial's records do not show taxes and utilities as a receivable to the partnership or as a payable by Imperial.

We conclude that although the evidence is conflicting, there is substantial evidence to support the trial court's determination that it was not the intent of the parties for Imperial to reimburse the partnership for property taxes and utility payments. Rather, payments were made by the partnership for the personal tax benefit of Wisotsky and Lerner individually. Thus, the court did not err by failing to allow payment of these taxes as an offset against the amounts found owing to Imperial.

## ATTORNEY'S FEES

We do not reach Lerner's and the partnership's arguments concerning the trial court's award of attorney's fees because of our disposition of the merits of this litigation. The trial court's award of attorney's fees must be reversed because our reversal on the issues of Lerner's entitlement to an award of $100,000 plus interest and Lerner's status as a partner affects the determination of who is the prevailing party. The trial court is directed to reconsider the claims for attorney's fees and costs upon remand in light of this opinion.

## CONCLUSION

In summary, we affirm the trial court's award of $64,813.87 plus interest against the partnership in favor of Imperial. We likewise affirm the trial court's finding that Lerner was not in breach of the non-competition covenant of the purchase and redemption agreement. However, we find that the trial court erred in failing to award Lerner $100,000 due and owing pursuant to the non-competition covenant, plus interest at the legal rate from the date of maturity. We reverse the trial court's judgment denying Lerner dissolution of M.J. Enterprises and reverse its finding that Lerner was a withdrawing partner, but remand for further proceedings on this issue.

As our disposition of this matter results in judgment for Lerner of $100,000 plus interest, an award of $64,813.87 against the partnership in favor of Imperial, and leaves the issue of whether M.J. Enterprises is to be a continuing partnership, we reverse the trial court's award of attorney's fees and costs.

Finally, attorney's fees are awarded to Lerner for this appeal in an amount to be determined following an appropriate submission pursuant to Rule 21(a), Arizona Rules of Civil Appellate Procedure.

This matter is remanded to the trial court for further proceedings in accordance with this opinion.

CORCORAN and CONTRERAS, JJ., concur.