This case involves a family farming partnership, A Bertolla 
Sons ("ABS"), which was formed in Baldwin County, in the early 1900's. The partnership assets consist of two farms totalling 1,800 acres; 920 additional acres of timberland; and a portfolio of securities. The fair market value of the partnership assets at the time of trial was estimated as $23-$25 million. In 1996, partner Mary Bertolla Bill and her son, partner Michael Charles Bill, filed this suit against her nephew, partner Andrew A. Bertolla (Andy) and the partnership, for dissolution. We affirm the trial court's holding that the partnership be dissolved and that the assets be distributed according to each partner's percentage interest in the partnership.
Alessandro Bertolla immigrated to Baldwin County, and began a farming operation in the early 1900's, growing and shipping fruits, vegetables and other market products. Since that time, he or his descendants have been farming under the name A. Bertolla 
Sons. Alessandro had 11 children, including Louis, Alexander, Angelo, Rudolph and John P., all of whom worked the farms with their father. His daughter Mary was born in 1913 and began working for ABS sometime in the 1920's. She worked in the fields, picked cotton, fed cattle, pumped water, and cleared new land. She also worked in the shipping and sales office.
Alessandro died in 1935 and his five sons continued to operate ABS. In 1941, Louis died intestate and the four surviving brothers were required to litigate with Louis's widow. MerchantsNat'l Bank of Mobile v. Bertolla, 245 Ala. 662, 18 So.2d 378
(1944), deals with that litigation and contains much of the history of the partnership.
In October, 1954, the four surviving brothers, Angelo, Rudolph, John P. and Alexander entered into the first written partnership agreement. Alexander Bertolla, father of Andy Bertolla, the defendant in this litigation, died in June, 1975. He was the first partner to die following the execution of the 1954 agreement. The surviving partners, consisting of Angelo, Rudolph and John P., exercised their option under the partnership agreement and bought his interest from his estate at 60 percent of its book value. Angelo died in September, 1975; John P. and Rudolph bought out Angelo's interest from his estate, also at book value.
In 1979, a new partnership agreement was drafted. The four new partners added in 1979 were Viola Bertolla and Mary Bertolla Bill, sisters of the original partners; John Eddie Bertolla, the son of John P. Bertolla; and Andy Bertolla, the son of Alexander Bertolla, each acquiring 10% of the partnership. They joined Rudolph F. Bertolla and John P. Bertolla who each owned 30%. The new partners paid the then book value of a 10 percent partnership interest; approximately $115,000 each. A formal partnership agreement was drawn up and signed by all of the partners. It read in pertinent part, as follows:
 5. The term during which the partnership shall continue is for an indefinite period and until terminated as herein provided or by operation of law.
 6. The parties shall each draw from the partnership such sums and at such times as may be mutually agreed upon and in the proportions hereinafter set forth shall share in all profits and losses of the business as follows:
Rudolph F. Bertolla 30%
John P. Bertolla 30%
Viola Bertolla 10%
Mary Bill 10%
John Edward Bertolla 10%
Alexander A. Bertolla 10%
100%
 7. Each of the partners is to devote such time and attention to the affairs of the business as may be deemed necessary by the partnership and is not to engage in any other competing business without the consent of the other partners. *Page 499 
 8. Proper books of account shall be kept, and therein shall be duly entered, from time to time, all dealings, transactions, matters and things whatsoever in or relating to the said business; and each party shall have full and free access thereto at all reasonable times, but shall not remove the same from the business premises.
 9. No partner shall, without the consent of the other partners, use the firm's name, credit or property for other than partnership purposes, or sign or endorse negotiable paper or become surety for third persons, or engage in any speculation or knowingly do any act by which the interests of the partnership shall be imperiled or prejudiced, except with the written consent of the other partners.
 10. Any partner may withdraw from the partnership upon giving six (6) months written notice to the other partner or partners of his intention so to do. In the event of the withdrawal of a partner, or in the event of the death of a partner, the partnership shall terminate. Immediately upon such death or withdrawal, the surviving or remaining partners shall determine if the partnership shall continue and shall cause to be made by an independent accountant an audit of the books of the business to determine the net worth of said business as shown by the books as of the date of said death or withdrawal. The surviving or remaining partners shall thereupon have an option for a period of sixty (60) days, exercisable by written notice to such withdrawing partner or to the personal representatives or heirs of such deceased partner, to purchase the interest of the withdrawing or deceased partner at 100 (100%) of the book value thereof, as shown by such audit, making payment therefor as follows: Within one hundred twenty (120) days of the exercise of said option, the withdrawing partner or the heirs, executor or administrators of the deceased partner shall be paid then percent (10%) of the purchase price, and the balance thereof shall be payable over a period of eight (8) years, commencing eighteen (18) months from the date of death or withdrawal, in equal annual installments, together with interest at the rate of seven percent (7%) per annum on the reducing principal balance outstanding from time to time. It is understood however, that the remaining partner or partners may prepay such payments in whole or in part in any amounts and at any time or times he or they may deem advisable. If all of the surviving or remaining partners elect to purchase the interest of the withdrawing or deceased partner, such purchase shall be in the proportions held by each such partner. If any partner elects not to participate in such purchase, such partner may continue to hold his or her original share and the remaining partners may purchase such withdrawing or deceased partner's share proportionately.
 11. In the event that a partner becomes either temporarily or permanently disabled, either physically or mentally, to such an extent that he is unable to perform his duties as a member of the partnership, he shall nevertheless continue to draw his full share as a partner during the term of the partnership, except that if any partner becomes permanently disabled to the extent aforesaid, any of the other partners may, in such case, upon giving six (6) months written notice to the others (including such incapacitated partner), terminate the partnership, and such incapacitated partner shall then be considered and treated in all respects as if he had given notice or withdrawal as provided for in paragraph 10 hereof, with resulting options and rights as therein provided.
 12. "Notwithstanding any other provision of this agreement, it is understood and agreed by the parties hereto that the management and control of the affairs of the partnership shall remain with Rudolph F. Bertolla, John P. *Page 500 
Bertolla, and Viola A. Bertolla, and the remaining partners will not undertake any act or enter into any commitment on behalf of or in the name of the corporation without the prior consent and authorization of Rudolph F. Bertolla, John P. Bertolla and Viola A. Bertolla. . . ."
At the time the 1979 agreement was executed, Viola Bertolla was serving as office manager; John Eddie Bertolla was overseeing all farming operations with the older men, John P. and Rudolph; Andy was serving as manager of Bertolla Farm Supply in Robertsdale and also helping his Uncle Rudolph at the Belforest Farm. Mary worked mainly in Bertolla Farm Supply.
Rudolph F. Bertolla died in 1980. The remaining partners continued the partnership. The partnership was challenged in 1982, when John Hons, a beneficiary under the wills of Angelo and Rudolph filed a suit challenging the valuation of the partnership's purchase of their interests at book value. The trial court entered summary judgment in favor of the partnership, which was affirmed in Hons v. A. Bertolla Sons, 537 So.2d 456
(Ala. 1988).
During 1986, the partners sought to remove John Edward Bertolla from the partnership for neglect of duty. At that point both J.P. and Viola were aged and in poor health. They vested management of the partnership in Mary and Andy who sought the advice of the partnership's attorney Harry Riddick. Riddick advised them by memo that any partner could dissolve the partnership any time he wished. John Edward ultimately released his partnership interest in exchange for a cash payment after his elderly father, J.P. Bertolla, intervened. J.P. Bertolla died that same year; Viola died in 1988. The buy-outs of J.P. and Viola's interests pursuant to the agreement resulted in Andy (son of Alexander) and Mary each with a 50% interest in the partnership. In 1989, Andy and Mary assigned 3% each of their respective interest to Mike Bill, Mary's son.
The testimony reflects that almost as soon as the management of the partnership was vested in Andy and Mary by the elderly partners in 1986, Andy began active management of the partnership with a complete disregard for Mary, contrary to the written agreement. For example, Andy spent $21,000 fixing up an old farm house on the property, without partnership approval. Andy paid bonuses during losing years to their nephew Adam Bertolla (son of John Eddie and who runs the operation of the Loxley farm) and their nephew Ray Bertolla (son of John Eddie and who runs the operation of the Belforest farm) without partnership consent. Andy put the partnership into a new business venture without consulting Mary. Rebecca Carr, a former bookkeeper at Bertolla Farm Supply testified that Andy closed the doors to his office to purposefully exclude Mary when he met with representatives from McFarland Cattle, one of the partnership's most significant accounts. Ms. Carr testified that Andy was very rude to Mary and that the relationship between them was very tense. Andy executed a $26,500 promissory note to a feed lot in Texas without consulting Mary or Mike, again in violation of the provisions of the partnership agreement.
In 1992, Mary's concerns increased when the regular financial reports detailed the partnership's losses. These losses totaled $1,170,200. Andy ignored Mary's concerns and began to attack her verbally. She broke out in hives as a result of his verbal abuse. Mary testified that Andy just would not quit spending. Richard Sisson testified that when Mary tried to have a conversation with Andy, he would just ignore her. An expert witness, Carl Johnson, testified that the partnership lost money every year from 1989-1992.
In the fall of 1994, Andy told Mary that the partnership was losing money because their bookkeeper was stealing. Mary responded that Andy was spending too much — that was the reason the partnership was losing money. Andy did not tell *Page 501 
Mary that he had already hired Buddy Russell, another accountant to check out the books. Mary did not learn about a special audit Andy had Buddy Russell make, until this litigation began. The report confirmed that the bookkeeper was not stealing, and that Andy was spending too much. Russell's report suggested that Andy eliminate pecan farming, but Andy refused. He stated that it didn't make any difference what anybody else thought, he was going to continue to farm. Andy then ordered that the bookkeeper keep a time card on Mary at Bertolla Farm Supply.
In 1995 Andy began secretly tape recording his 85 year old Aunt Mary in hopes that she would say that she would withdraw from the partnership. Mary refused to withdraw and insisted that the partnership be dissolved. Mary asked Kenny Hanak, an accountant and family friend, to hold a partnership meeting in his office. On February 25, 1995, Mary and Mike, through Hanak, told Andy that they wanted to dissolve the partnership. Andy taped this meeting also. Ultimately a vote was taken and Mary and Mike voted their 53% to dissolve the partnership. Andy would not accept the vote and vowed to continue farming.
After Andy refused to accept the vote to dissolve the partnership, Mary and Mike signed, as representatives of the partnership, quitclaim deeds that removed their combined 53% interest from the partnership. Mary and Mike had their attorney write Andy's lawyer to notify Andy that he should make no further purchases in the partnership's name. Despite this notification, Andy signed a note to purchase a cotton picker for $154,977. Mary and Mike sent notifications to McMillan and Harrison that Andy was not longer authorized to buy supplies for Bertolla Farm Supply. Despite these measures, Andy continued to farm and make charges on these accounts.
In 1996, plaintiff Mary Bertolla Bill and her son, Mike Charles Bill, filed this suit against Andy and the partnership, for dissolution, breach of partnership agreement, breach of fiduciary duty and an accounting. Andy answered, admitting that ABS was dissolved, but asserting that the Bills could only get book value for their interests under the partnership agreement. He also counterclaimed, seeking damages for wrongful dissolution and fraudulent inducement of the grant of a partnership interest to Mike Bill. The trial court severed the fraud claims from the equitable claims. The plaintiffs later amended their complaint to include counts for wrongful exclusion, fraud and for a declaratory judgment. A second amended complaint amended the allegations of the breach of fiduciary duty count and supplemented the fraud allegations with one count of fraudulent suppression and two counts of deceit.
A bench trial of the equitable claims was held before the Honorable Charles C. Partin who heard evidence for four days. Andy Bertolla conceded that the partnership had been dissolved, pursuant to the terms of the partnership agreement, but contended that the Bills could only get the book value for their interests under the partnership agreement. The trial court's order of January 26, 1998, found under the evidence presented it was not reasonably practicable for the partners to carry on the business in partnership together and dissolved the partnership:
 The above-styled and captioned matter came on for hearing on June 30 and July 1, 2 10, 1997. The Court heard the evidence and considered all relevant evidence presented by both Plaintiffs and Defendant. The Court hereby ORDERS, ADJUDGES and DECREES as follows:
 1. The Court finds that it is not reasonably practicable for the partners to carry on the business in partnership together and the circumstances render a dissolution equitable. Therefore, A. Bertolla Sons, an Alabama general partnership, is dissolved as of the date of this order. *Page 502 
 2. The partners, Mary Bertolla Bill, Michael Charles Bill, and Andrew A. Bertolla shall wind up the partnership affairs in accordance with the provisions of this order.
 3. As of the date of this order no partner is due to account to the partnership or the other partners; all assets of the partnership are in the possession of the partnership and no marshalling is required; partnership property consists of all real and personal property in the partnership name; the assets and liabilities of the partnership are as shown by the evidence and no contributions of the partners are necessary.
 4. The partnership assets shall be sold by the partnership at private sale as follows: the stocks, bonds, and other securities shall be sold within thirty (30) days of the date of this order; all other property shall be immediately placed on the market and sold as soon as practicable thereafter subject to the approval of the Court.
 5. All partnership liabilities shall be paid as soon as possible in the following order: those owing to creditors other than partners within thirty (30) days after the sale of stocks, bonds and other securities; those owing to partners other than for capital and profits immediately thereafter; those owing to partners in respect of capital immediately thereafter; and those owing to partners in respect of profits immediately thereafter.
 6. Any liability of the partnership to partners with respect to capital and profits, all proceeds of sales paid to partners, and all other payments paid to partners shall be made according to their respective partnership interest in the following proportions: Mary Bertolla Bill 47%; Michael Charles Bill 6%; and Alexander A. Bertolla 47%.
 7. All other claims and causes of action not previously severed are dismissed.
DONE this the 26th day of January, 1998.
/s/ CHARLES C. PARTIN
The defendant filed a motion to alter amend or vacate which was granted in part and denied in part. On May 4, 1998, the trial court issued an amended order which called for an accounting and the in-kind distribution of the securities to the partners according to their interests. The partnership's real property was to be placed on the market, sold and the proceeds distributed in accordance with the original order. The court stayed enforcement of its order pending this appeal:
 1. Paragraph 3 of the order is vacated. As of the date of this order all assets of the partnership are in the possession of the partnership and no marshalling is required; partnership property consists of all real and personal property in the partnership name; the assets and liabilities of the partnership are as shown by the evidence and no contributions of the partners are necessary. An accounting shall be rendered of the accounts of the partnership from January 1, 1996, by the accounting firm of Robertson, Andreoli Associates. Costs of this accounting shall be paid by the partnership, and the results of the accounting shall be reported to the Court.
 2. Paragraph 4 of the order is vacated. The partnership assets shall be distributed to the partners as follows: the stock, bonds and other securities shall not be sold, but shall be divided in kind and distributed to the partners in accordance with their proportionate partnership interests as set out in the order; all other partnership assets, which include the real property noted in Plaintiff's Exhibit 36(a) shall be placed on the market and sold at private sale by the partnership as soon as practicable and subject to the approval of the Court.
 3. "The enforcement of the Order of January 26, 1998, is stayed pending appeal. *Page 503 
The Court retains jurisdiction to enter such other orders as may be necessary regarding the operation and affairs of the partnership pending appeal. . . ."
This case was heard ore tenus. Where ore tenus evidence is presented to the trial court in a nonjury case, a judgment based on that evidence is presumed to be correct and will not be disturbed on appeal unless a consideration of the evidence and all reasonable inferences therefrom reveals that the judgment is plainly and palpably erroneous or manifestly unjust. Arzonico v.Wells, 589 So.2d 152, 153 (Ala. 1991); King v. Travelers Ins.Co., 513 So.2d 1023 (Ala. 1987); McCrary v. Butler, 540 So.2d 736
(Ala. 1989). "The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment. McCrary v.Butler, supra; Jones v. Jones, 470 So.2d 1207 (Ala. 1985)."Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 12-13
(Ala. 1989).
As previously stated, the question before us is whether the trial court is plainly and palpably in error or manifestly unjust in ordering this partnership to be dissolved and the assets distributed according to each partner's interest. ABS is an Alabama general partnership, governed by the Alabama Partnership Act, codified at § 10-8-1 et seq., Ala. Code 1975. The plaintiffs sought a judicial dissolution of the ABS partnership. Section 10-8-92(a), Ala. Code 1975, provides for judicial dissolution of a partnership:
 (a) On application by or for a partner, the court shall order a dissolution whenever:
 (1) A partner has been declared in any judicial proceeding or is otherwise shown to be a person of unsound mind;
 (2) A partner becomes in any other way incapable of performing his part of the partnership contract;
 (3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business;
 (4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him;
 (5) The business of the partnership can only be carried on at a loss; or
 (6) "Other circumstances render a dissolution equitable."
The trial judge based his ruling that the partnership must be dissolved upon four days of trial testimony. While Andy contends that there is no evidence in the record to support any of the grounds the trial court relied upon to dissolve the partnership, the evidence supports the trial court's order of dissolution on the ground of the impracticability of the partners carrying on the business. The evidence clearly shows that it was "not reasonably practicable" for them to remain in partnership. § 10-8-92(a)(4). Every witness who was asked whether Andy and Mary could continue in partnership with each other answered that they could not. It is well settled that partners who cannot interact with each other should not have to remain bound together in partnership. Owen v.Cohen, 19 Cal.2d 147, 119 P.2d 713 (1941) (interpreting a provision identical to § 10-8-92, Alabama Partnership Act).
The evidence also supports judicial dissolution on the ground of Andy's misconduct. Section § 10-8-92(a)(3) allows judicial dissolution when "a partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business." This statute codifies Alabama caselaw that authorizes dissolution of a partnership on the ground of the misconduct of a partner.Brooke v. Tucker, 149 Ala. 96, 43 So. 141 (1907). 59A Am.Jur.2dPartnership § 857 (1987) lists certain acts as conducted by a partner that are sufficient to warrant judicial dissolution: 1) Unilateral *Page 504 
decisions as to the management of the partnership; 2) Exclusion of partner from partnership affairs; 3) Willful and persistent breach of partnership agreement; 4) Refusal to discuss partnership affairs; 5) Misappropriation of partnership funds; 6) Negligent and incompetent handling of partnership affairs. The record supports judicial dissolution in this case because there was evidence that Andy some 16 times breached the partnership agreement's prohibition against signing negotiable instruments without authority. Accountant Carl Johnson testified that Mary's concerns related to the farm losses were legitimate. Without the "nest egg" of securities from the profits run by the shipping business which were put away by Mary's brothers, Andy would have bankrupted the partnership. The testimony in the record demonstrating Andy's misconduct as a partner is sufficient to support the trial court's order.
While Andy contends that Mary withdrew from the partnership, the facts do not support this conclusion. Andy's attempt to trick Mary into saying she would withdraw while secretly tape recording his conversations with her failed. Courts interpreting the Uniform Partnership Act have held that a request for judicial dissolution is not tantamount to withdrawal by the requesting partner. Cooper v. Isaacs, 448 F.2d 1202 (D.C. Cir. 1971);Imperial Litho/Graphics v. M.J. Enterprises, 152 Ariz. 68,730 P.2d 245 (Ariz.Ct.App. 1986).
Mary denies that she withdrew from the partnership and notes that, although Andy alleges she withdrew, he completely failed to perform any of the conditions precedent to exercise the option available to remaining partners when a partner withdraws, all contained in paragraph 10 of the partnership agreement. Andy did not act immediately, did not have an audit performed, did not exercise the option to buy at book value within 60 days, and has not paid any of the money that would be due to Mary or Mike because of the alleged "withdrawal."
When the ABS partnership agreement was written, the provisions for buyouts of deceased partners' shares were structured to qualify for special estate tax treatment. Andy argues that the provisions of the partnership agreement which were written to take advantage of the tax laws restrict lifetime transfers of partnership interests to book values and also restrict a partner's right to dissolve.
However, these provisions, which at the time took advantage of favorable tax laws, do not control the rights of partners to dissolve an at-will partnership. Alabama partnership law controls. The ABS partnership agreement does not expressly provide for the distribution of partnership assets upon dissolution. The distribution of the partnership assets is governed by the provisions of the Uniform Partnership Act, under which each partner is entitled to receive the fair market value of his or her interest in the partnership. § 10-8-97, Ala. Code 1975. Andy argues that the assets of the partnership should be distributed according to their book value, drawing upon the "unless otherwise agreed" language of § 10-8-97. However, a plain reading of the partnership agreement does not support this conclusion. Furthermore, it would be inherently unfair. The book value of the partnership assets at the time of the trial was approximately $1.5 million; the fair market value of the assets at the time of trial was $24.5 million. The trial judge correctly ordered the sale for distribution of the assets to the partners according to their interests. This is required by the Alabama Partnership Act. It is also the fair and equitable resolution to this case. See Mahanv. Mahan, 107 Ariz. 100, 482 P.2d 863 (Ariz. 1971).
The Alabama Uniform Partnership Act expressly authorizes the dissolution of the partnership as ordered by the trial court. The distribution of the assets of the partnership is based upon facts provided by the accountants for both the Bills and Andy Bertolla. Findings of fact based on *Page 505 ore tenus evidence are presumed correct even though there may have been conflicting evidence. Deloney v. Chappell, 570 So.2d 622,625 (Ala. 1990). In light of the evidence from the record set out above, our review of the record, and the attendant presumptions of correctness accompanying that evidence, the judgment of the trial court is affirmed. Arzonico, 589 So.2d at 153.
AFFIRMED.
Hooper, C.J., and Maddox, Houston, Kennedy, Cook, Lyons, Brown, and Johnstone, JJ., concur.