The plaintiffs, Sue Winkleblack and J. Douglas Winkleblack, as personal representatives of the estate of Jack D. Winkleblack, deceased, and Links of the Southeast, Inc., appeal from a judgment entered by the Barbour Circuit Court in favor of the defendants, Michael P. Murphy, Sr., as personal representative of the estate of *Page 523 
James D. Murphy, Jr., deceased, and Country Club of Alabama, Inc. The principal legal issue presented on appeal is whether the trial court correctly construed the provisions of several interrelated contractual agreements involving the parties and properly determined their relationship. We affirm the judgment of the trial court.
 Facts and Procedural History
James D. Murphy, Jr., incorporated Country Club of Alabama, Inc. ("CCA"), to develop a golf course and residential community in Barbour County. On April 9, 1991, Murphy entered into an agreement entitled "Contract and Employment Agreement" (the "Contract") with Pepperland Property, Inc. ("Pepperland"), a Georgia corporation, for Pepperland to market and sell the lots at CCA's development. Under the terms of the Contract, Pepperland's initial compensation was to come only from the fees paid for options to purchase the lots, but after sales were sufficient to pay off the $380,000 balance of a note owed to Eufaula Bank and Trust Company ("EBT"), Pepperland was to begin receiving half of the "net proceeds" from sales of the lots. According to the Contract, "net proceeds" meant the sales price less closing costs.
On December 11, 1991, Pepperland; its sole shareholder; the plaintiffs; and the defendants entered into several agreements. Pepperland, its sole shareholder, and the plaintiffs executed an instrument entitled "Assignment of Interest in Real Estate Owned by CCA, Inc., an Alabama Corporation" (hereinafter the "Assignment"). In the Assignment, Pepperland and its shareholder assigned to Links of the Southeast, Inc. (hereinafter "Links") and its sole shareholder, Jack D. Winkleblack, "all [their] rights, privileges, immunities, interest, and responsibilities in the remaining unsold lots and acreage owned by CCA." Neither Murphy nor CCA was a party to this Assignment.
Exhibit A to the Assignment was entitled "Statement and Certification of Unsold Lots and Acreage and of Minimum Prices for Remaining Lots and Acreage" (hereinafter the "Certification"). In this document, Pepperland and its sole shareholder, together with Murphy and CCA, acknowledged the following: that title to certain specified lots and six acres of multi-family property was vested in CCA, Inc., and was subject to a mortgage held by EB T; that those properties were unsold; and that minimum prices for the unsold lots and the acreage had been established.
Exhibit B to the Assignment was entitled "Agreement and Acknowledgment of Assignment" (hereinafter the "Agreement"). In the Agreement, Murphy and CCA approved the Assignment by Pepperland to Winkleblack and Links and "acknowledge[d] and agree[d]" that Winkleblack and Links "has an undivided one-half (½) interest in and to the proceeds of all sales of the remaining unsold lots and acreage in the Country Club of Alabama Subdivision as shown on Exhibit A." The Agreement further provided:
 "[I]n consideration of not conveying title to purchaser for an undivided one-half (½) interest in and to the remaining unsold lots and acreage in the Country Club of Alabama Subdivision that purchaser shall receive one-half (½) of the proceeds of the sales prices of each of the remaining lots and acres in the Country Club of Alabama Subdivision, free and clear of all liens and encumbrances and on the date of the closing of each sale."
The parties to the Agreement also agreed that the minimum prices shown in the Certification (Exhibit A) would not be increased or decreased except by mutual written consent. *Page 524 
Despite the fact that the Agreement designated Murphy and CCA as "owners," and Winkleblack and Links as "purchasers," the Agreement contained no words of conveyance, i.e., no real estate was conveyed as a result of the Agreement. The Assignment and its Exhibits were prepared by the attorney representing Winkleblack and Links.
In May 1996, Murphy sold Lots 16 and 72 in the CCA subdivision, and he issued checks to Winkleblack in the amounts of $3,125 and $4,125. Winkleblack later died. Winkleblack had not negotiated the two checks, and they were found among his possessions after his death.
On August 13, 1999, Sue Winkleblack and J. Douglas Winkleblack, as personal representatives of the estate of Jack D. Winkleblack, deceased; and Links (hereinafter the three are collectively referred to as "Winkleblack") filed this action in the Barbour Circuit Court against James D. Murphy, Jr., and Country Club of Alabama, Inc., of which he was the sole owner (hereinafter the two are collectively referred to as "Murphy"). The plaintiffs alleged that Murphy had breached his contract with Winkleblack, and they demanded an accounting. The plaintiffs also alleged that they were entitled to one-half of the proceeds from the sale of the lots specified in the Certification. Murphy answered that the plaintiffs were entitled to one-half of the proceeds from the sale of the specified lots only if the conditions of the Contract with Pepperland were fulfilled. James D. Murphy, Jr., died before the trial of this action; Michael P. Murphy, Sr., as his personal representative, was substituted as a defendant.
The action was tried without a jury, and the trial court heard evidence presented ore tenus. The trial court initially held in favor of Winkleblack, finding that he was entitled to one-half of the proceeds from the sale of the lots that had been sold at the CCA subdivision and ordered an accounting; the trial court also held that Winkleblack was entitled to one-half of the proceeds from any future sales of any of the specified lots.
Murphy then filed a motion to alter, amend, or vacate the judgment, asserting that the trial court's judgment should be vacated, because, Murphy contended, the court had not had before it sufficient evidence to support a finding that Winkleblack had discharged his duties and obligations, as assignee, to market and sell the lots and to perform other duties required in order to earn his commission on the sale of the lots. Murphy also asserted that the language contained in the Assignment, the Certification, and the Agreement was ambiguous in that, among other things, he contended, it purported to assign the proceeds of the sale of the lots to Winkleblack without assigning any of the corresponding obligations and duties provided for in the original Contract with Pepperland. Further, Murphy asserted that he could not comply with the trial court's judgment because, he contended, it failed to specify the duties and obligations owed by the plaintiffs to the defendants under the Assignment and the other documents and failed to define the term "sales price" or the term "minimum prices," as they were used in the Assignment and other documents.
After conducting a hearing on these issues, the trial court entered an amended judgment. In its amended judgment, the trial court concluded that, when read together, the language in the Assignment, the Certification, and the Agreement, was ambiguous. The trial court concluded that Pepperland could assign to Winkleblack only those interests it possessed at the time of the Assignment. Because Pepperland possessed no real property rights in the CCA development, Pepperland, the court held, could not convey any real property *Page 525 
rights in that development to Winkleblack. Further, the trial court concluded that, along with its rights and interests, Pepperland had also assigned to Winkleblack its contractual responsibilities and obligations regarding the marketing and sale of the lots and acreage located in CCA. Thus, in its amended judgment, the trial court concluded:
 "In the original employment contract, Pepperland agreed to market and sell lots at CCA; to secure purchase options from prospective purchasers on the form provided; and, to collect the option fees. Pepperland was entitled to keep the option fees until sales were sufficient to retire the EBT loan. Thereafter, Pepperland was entitled to one-half the net proceeds from the lots it sold.
 "Plaintiffs are entitled to no less and no more under the Agreement. If and when Plaintiffs market and sell lots, they will be entitled to the compensation specified under the Assignment. However, they are entitled to no compensation unless they do discharge their obligations to sell and market lots."
(C. 156.) The trial court's amended judgment further stated:
"IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED that:
 "1. In the event plaintiffs fulfill their responsibilities under paragraphs 1 and 2 of the assumed contract, they will be entitled to the compensation provided for in paragraphs 3 and 4 of the contract; and, after sufficient proceeds have been collected to retire the EBT loan, plaintiffs will be entitled to receive as `additional salary' one-half of the net proceeds from the sale of the lots which they market and sell. (¶ 5 and [¶] 7 of the Contract.)
 "2. Defendants may sell lots without the assistance of Plaintiffs. In such event, defendants will not incur any obligation to plaintiffs for fees or salary, but the proceeds of such sales will apply to reduce the EBT loan balance.
 "3. The parties have thirty days to make an accounting showing lots sold and proceeds applied to the EBT loan.
 "4. If a lot or acreage is sold for less than the established or agreed `minimum price,' defendants' obligation to plaintiffs will be computed by using the minimum price. However, if a lot is sold for more than minimum price, defendants' obligation to plaintiffs will be computed using the sales price."
(C. 163.)
Winkleblack appeals from this amended judgment. He presents the following issues:
 "I. Whether the [trial] Court properly construed the provisions of 1) the Assignment of Interest in Real Estate, 2) [the] Statement and Certification of Remaining Unsold Lots and Acreage and of Minimum Prices for Remaining Lots and Acreage, and 3) [the] Agreement and Acknowledgment of Assignment.
 "II. Whether Murphy waived any claim of nonperformance by way of failing to plead it in its Answer.
 "III. Whether Murphy [is] estopped to assert the defense of nonperformance."
 Standard of Review
The question whether a contract is ambiguous is for a court to decide.State Farm Fire Cas. Co. v. Slade, 747 So.2d 293 (Ala. 1999). As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law. Commercial Credit Corp. v. Leggett,744 So.2d 890 (Ala. 1999). Thus, we apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination *Page 526 
of the legal effect of an unambiguous contract term.
Once the trial court determines that an ambiguity exists in a contract, the meaning of that contract is to be determined by the trier of fact. Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala. 1998); Glenlakes Realty Co. v. Norwood, 721 So.2d 174 (Ala. 1998). In this case, the trier of fact was the trial court, and the court heard oretenus evidence.
 "Where ore tenus evidence is presented to the trial court in a nonjury case, a judgment based on that evidence is presumed to be correct and will not be disturbed on appeal unless a consideration of the evidence and all reasonable inferences therefrom reveals that the judgment is plainly and palpably erroneous or manifestly unjust."
Bertolla v. Bill, 774 So.2d 497, 503 (Ala. 1999) (quoted in Redden v.State, 804 So.2d 196 (Ala. 2001)).
 Discussion Issue I "Whether the [trial] court properly construed the provisions of the [Assignment, the Certification, and the Agreement.]"
We first consider whether the trial court's determination that the provisions of the Assignment, the Certification, and the Agreement, when read together, created an ambiguity and whether the trial court properly construed those provisions. Winkleblack asserts that the provisions of the Assignment, the Certification, and the Agreement are unambiguous and should be enforced as written. He argues that the following language of paragraphs 2 and 3 of the Agreement entitles him to one-half of the proceeds from the sale of the specified CCA lots sold since December 11, 1991:
 "2. Owner acknowledges and agrees that purchaser has an undivided one-half (½) interest in and to the proceeds of all sales of the remaining unsold lots and acreage in the Country Club of Alabama Subdivision as shown on Exhibit `A', Statement and Certification of Remaining Unsold Lots and Acreage and Minimum Prices for Remaining Lots and Acreage.
 "3. Owner acknowledges and agrees that in consideration of not conveying title to purchaser for an undivided one-half (½) interest in and to the remaining unsold lots and acreage in the Country Club of Alabama Subdivision that purchaser shall receive one-half (½) of the proceeds of the sales prices of each of the remaining lots and acres in the Country Club of Alabama Subdivision, free and clear from any liens and encumbrances and on the date of the closing of each sale."
Murphy, in opposition, maintains that Winkleblack, as an assignee of the Contract between Murphy and Pepperland, stepped into the shoes of Pepperland, the assignor. Murphy asserts that, when Pepperland assigned the Contract to Winkleblack, it assigned all of its "rights, privileges, immunities, interest, and responsibilities in the remaining unsold lots and acreage owned by CCA." Murphy further asserts that when Winkleblack accepted the assignment, he accepted the obligation to fulfill Pepperland's duties under the Contract, which included the duty to assist in marketing and selling the lots in CCA's development before becoming entitled to any commission.
This Court has previously stated that "[a] valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses." Nissan Motor Acceptance Corp. v. Ross, 703 So.2d 324, 326
(Ala. 1997). We have also recognized that
 "`the assignee under a general assignment of an executory bilateral contract, in the absence of circumstances showing *Page 527 
a contrary intention, becomes the delegatee of his assignor's duties and impliedly promises his assignor that he will perform such duties.'"
Meighan v. Watts Constr. Co., 475 So.2d 829, 834 (Ala. 1985), quotingRose v. Vulcan Materials Co., 282 N.C. 643, 194 S.E.2d 521 (1973), citing, in turn, Restatement of Contracts § 164 (1932).
In the original employment contract with Murphy and CCA, Pepperland agreed to market and sell lots in the CCA development; to sell purchase options to prospective purchasers; and to collect the option fees. Pepperland was entitled to retain the option fees until sales were sufficient to retire the EBT loan. Thereafter, Pepperland was entitled to one-half of the net proceeds from the specified lots sold.
We find no language in the Assignment indicating any intent to relieve Winkleblack from any contractual duties and obligations owed by Pepperland to Murphy. Considering the language of the Assignment and the lack of circumstances showing a contrary intention, we conclude that when Pepperland assigned its "rights, privileges, immunities, interest, and responsibilities in the remaining unsold lots and acreage owned by CCA," acceptance of this assignment included an assumption of Pepperland's duties to assist in marketing and selling of the specified lots at CCA's development. See Meighan v. Watts Constr., supra.
We also conclude that the provisions contained in the Assignment, the Certification, and the Agreement present an ambiguity. As discussed above, the Assignment transferred to Winkleblack all of the "rights, privileges, immunities, [and] interest" held by Pepperland and the "responsibilities" owed by Pepperland to Murphy and CCA. This assignment included a transfer of Pepperland's duties to market and sell CCA lots.
However, the Agreement, which was incorporated as an exhibit to the Assignment, purports to give Winkleblack a "one-half (½) interest in and to the proceeds of all sales of remaining unsold lots and acreage in the Country Club of Alabama Subdivision as shown on Exhibit A" and provides that Winkleblack "shall receive one-half (½) of the proceeds of the sales prices of each of the remaining lots and acres. . . ., free and clear from any liens and encumbrances and on the date of the closing of each sale." This language appears to conflict with the requirement that Winkleblack fulfill Pepperland's duties and obligations to Murphy before earning the commissions specified in the Assignment. We agree with the trial court that the language in the Agreement, when read with the language in the Assignment, creates an ambiguity.
In Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala. 2000), this Court addressed numerous principles a court is to apply when interpreting an ambiguous contract provision:
 "Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. Under those established rules of contract *Page 528 
construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. Additionally, `if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed.' Last, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of contra proferentem, any ambiguity must be construed against the drafter of the contract."
Homes of Legend, 776 So.2d at 746 (citations omitted). We have also stated:
 "Terms of a written instrument should be construed in pari materia and a construction adopted that gives effect to all terms used. Inconsistent parts in a contract are to be reconciled, if susceptible of reconciliation; however, if that is not possible, any doubt will be resolved in favor of the first part, considering the instrument as a whole."
Sullivan, Long Hagerty v. Southern Elec. Generating Co., 667 So.2d 722,725 (Ala. 1995).
Here, the court was the trier of fact, and the court's judgment was based upon ore tenus evidence. Accordingly, the judgment is "presumed to be correct and will not be disturbed on appeal unless a consideration of the evidence and all reasonable inferences therefrom reveals that the judgment is plainly and palpably erroneous or manifestly unjust."Bertolla v. Bill, supra, 774 So.2d at 503. Based upon the record before us, we cannot hold that the trial court's judgment is plainly and palpably erroneous or manifestly unjust. To the contrary, we conclude that the judgment is a reasonable one.
This Court must presume that the parties intended to make a reasonable contract. Ex parte Agee, 669 So.2d 102 (Ala. 1995). Construing the Assignment and the Agreement to give effect to all of the terms in the order in which they are presented, the court could reasonably conclude that when Winkleblack accepted the Assignment he assumed the responsibilities of marketing and selling lots and selling options and collecting option fees and became entitled to one-half of the proceeds only after the EBT loan had been paid. It is reasonable to conclude, based upon the language of the Assignment, that the parties intended for Winkleblack to assist in the efforts to market and sell CCA lots, just as Pepperland was required to do. See Meighan v. Watts Constr. Co., supra. To reach the conclusion urged by Winkleblack — that he is entitled to one-half of the proceeds from the sale of the CCA lots without assisting in marketing and selling those lots — one would have to conclude that Murphy intended to make a gift to Winkleblack. No evidence in the record supports such a conclusion. Moreover, any inconsistency in the documents that cannot be reconciled must be construed against Winkleblack, because his attorney drafted the Assignment and the exhibits. See Homes of Legend, supra.
We conclude that the trial court's construction of the ambiguous provisions is a reasonable one and one that is not plainly and palpably erroneous or manifestly unjust. Accordingly, we affirm the judgment of the trial court insofar as it construes the ambiguous contract provisions.
 Issue II "Whether Murphy waived any claim of nonperformance by failing to [affirmatively] plead it in his answer."
Winkleblack argues that because Murphy failed to raise as an affirmative *Page 529 
defense Winkleblack's nonperformance under the contract, Murphy has waived any claim of nonperformance as a defense to the breach-of-contract claim. We reject this argument.
"A plaintiff can establish a breach-of-contract claim by showing `(1) the existence of a valid contract binding the parties in the action, (2)his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" State Farm Fire Cas. Co. v. Slade, supra, 747 So.2d at 303 (quoting Southern Med. Health Sys., Inc. v.Vaughn, 669 So.2d 98, 99 (Ala. 1995) (emphasis added)); see alsoEmployees' Benefit Ass'n v. Grissett, supra. Thus, in order to establish that a defendant is liable for a breach of a bilateral contract, a plaintiff must establish that he has performed, or that he is ready, willing, and able to perform under the contract. Accordingly, Winkleblack is essentially arguing that Murphy may not rely upon Winkleblack's failure to establish an essential element of the breach-of-contract claim. In BellSouth Mobility, Inc. v. Cellulink, Inc., [Ms. 1990082, May 25, 2001] ___ So.2d ___ (Ala. 2001), this Court addressed a similar argument. In that case, Cellulink sued BellSouth, alleging, among other things, that BellSouth had interfered with contractual relations between Wal-Mart and Cellulink. On appeal, BellSouth argued that it was a party to the relationship between Cellulink and Wal-Mart and, thus, could not be liable for interfering with that contract. Cellulink responded by arguing that the "party-to-the-relationship" argument was an affirmative defense that had not been sufficiently pleaded and proved and, thus, could not be raised on appeal.
This Court rejected that argument, holding that Cellulink was required to prove, as an essential element of its tortious-interference-with-contractual-relations claim, that BellSouth was a stranger to the contract with which BellSouth had allegedly interfered. "This is so, because `a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract.'"BellSouth Mobility, ___ So.2d at ___ (citation omitted). We also have recognized:
 "`One is not a stranger to the contract just because one is not a party to the contract. . . .' Because the absence of [BellSouth's] involvement in the business relationship is an element of [Cellulink's] tortious-interference claim, we reject Cellulink's contention that BellSouth may not assert that argument on appeal."
BellSouth Mobility, ___ So.2d at ___ (citations omitted) (emphasis inBellSouth Mobility).
Under the same rationale we applied in BellSouth Mobility, we conclude that Murphy is not prohibited from relying upon a claim that Winkleblack failed to perform under the contract. Because Winkleblack was required to establish his performance as an essential element of his breach-of-contract claim, we conclude that Murphy did not waive this issue by failing to raise nonperformance as a defense in his answer to the complaint.
Further, at trial Murphy raised the issue of Winkleblack's nonperformance. Although Winkleblack objected, on the basis that the "affirmative defense" had not been asserted in Murphy's answer and, thus, he claimed, had been waived, the trial court did not rule on this objection and Winkleblack did not request a ruling.
Rule 15(b), Ala.R.Civ.P., states, in pertinent part:
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. . . . If evidence is objected to at the trial on the *Page 530 
ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits."
Thus, even assuming that the issue of nonperformance should have been asserted in Murphy's answer as an affirmative defense, see Rule 8(c), Ala. R. Civ. P, or as a denial of a condition precedent, see Rule 9(c), Ala.R.Civ.P., in Murphy's answer, the issue was presented to the court during the trial. Moreover, as noted above, Winkleblack was required to establish that he had, in fact, performed, or that he was ready, willing, and able to perform, in order to establish that Murphy had breached the contract. Thus, allowing an amendment to Murphy's answer to include the defense of nonperformance could not have prejudiced Winkleblack, and the trial court could have considered the pleadings to have been amended to conform to the evidence, pursuant to Rule 15(c), Ala.R.Civ.P. For these reasons, we reject Winkleblack's argument that Murphy waived any claim of nonperformance by failing to affirmatively plead that claim in his answer.
 Issue III "Whether Murphy [is] estopped to assert the defense of nonperformance."
Winkleblack argues that because Murphy, in 1996, paid Winkleblack one-half of the proceeds from the sale of two of the CCA lots, Murphy is now estopped from asserting Winkleblack's nonperformance under the Assignment. We find no specific reference to this issue in the record and no indication that Winkleblack expressly raised the issue of estoppel before the trial court. We cannot consider arguments raised for the first time on appeal. See McGinnis v. Jim Walter Homes, Inc.,800 So.2d 140 (Ala. 2001). Accordingly, this argument provides no basis to overturn an otherwise proper judgment.
 Conclusion
We conclude that the trial court correctly determined that the provisions of the Assignment, the Certification, and the Agreement, when read together, were ambiguous. We also conclude that the trial court's construction of those ambiguous provisions was not plainly and palpably erroneous or manifestly unjust but, rather, was a reasonable one. We find no merit in the other issues raised on appeal. We affirm the judgment of the trial court.
AFFIRMED.
See, Brown, and Harwood, JJ., concur.
Moore, C.J., concurs in the result.